**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| CONNIE M. GRETILLAT, | |
| Plaintiff, | No. 05-CV-05-LRR |
| vs. | **ORDER** |
| CARE INITIATIVES, | |
| Defendant. | |

_____

*TABLE OF CONTENTS*

*I.   INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.  STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . . . . . **2**

*III. UNDISPUTED MATERIAL FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . **3**

*IV.  PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

*V.   ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    *A.   Is Gretillat Disabled?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
        *1.   Which limitations did Care Initiatives know about?* . . . . . . . **8**
        *2.   Is Gretillat "substantially limited" in the
            "major life activities" of walking, standing and working?* . . . **13**
            *a.   Are walking, standing and
                 working "major life activities"?* . . . . . . . . . . . . . . . . **13**
            *b.   Is Gretillat "substantially limited" in her
               ability to walk, stand or work?*
               *i.   Walking and standing* . . . . . . . . . . . . . . . . . . **13**
               *ii.  Working* . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
    *B.   Remaining Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*VI.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

## I. INTRODUCTION

Before the court is Defendant Care Initiatives's Motion for Summary Judgment (docket no. 10).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *Woods*, 409 F.3d at 990.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Anderson*, 477 U.S. at 248; *Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III. UNDISPUTED MATERIAL FACTS

In 1990, Care Initiatives hired Connie Gretillat to work as a Dietary Services Manager at its nursing home in Eldora, Iowa.[1] Gretillat's primary responsibilities included creating care plans for nursing home residents, making the schedule for the kitchen, ordering and putting away groceries, reviewing menus and assisting a dietician in the assessment of each resident.

Care Initiatives's official job description for the Dietary Services Manager position indicates that an "essential job function" is to "[p]erform any food service task necessary to provision of meals according to schedule and standards of practice; 'covers' for absent staff if unable to find a replacement."[2] The job description indicates that the Dietary Services Manager, among other things, would be called upon to kneel, crouch and crawl.

Until the mid-1990s, Gretillat covered full shifts in the kitchen because there was not enough staff to cook. Since then, Gretillat sometimes covered two to three hours of a kitchen shift.

In late 1999 or early 2000, Gretillat began to suffer severe pain in her right knee. Gretillat was diagnosed with osteoarthritis. Gretillat's supervisor, Monte Priske, observed that Gretillat had trouble walking long distances. Gretillat also told Priske it hurt to walk long distances. Priske excused Gretillat from making rounds of the facility. Making rounds was not an essential function of the Dietary Services Manager.

On September 22, 2003, Gretillat underwent surgery and had her right knee

---

[1] Gretillat began working at the Valley View Nursing and Rehabilitation Center in 1986 as a cook.

[2] The job description was created in 1993. It was revised in 2003 to reflect the amounts of time spent on various activities. Gretillat signed the 1993 job description but did not sign the 2003 job description.

3

replaced. The purpose of the surgery was to reduce Gretillat's pain, not restore function. On November 18, 2003, Dr. Margaret Fehrle released Gretillat to return to work without any restrictions. Dr. Fehrle's form contained unchecked boxes for restrictions on bending, crawling, reaching, squatting, stooping, finger movement, climbing, kneeling, sitting, standing, walking, wrist and hand movement.

At some unknown point in time after Gretillat's surgery, Priske told Gretillat that, if she wanted to continue to work full-time, she would have to work in the kitchen as a cook two to three days a week. The Eldora nursing home had a declining census, i.e., population. Priske claims the hours in the kitchen given to Gretillat depended upon the census. As the census decreased, Care Initiatives needed Gretillat to spend more time in the kitchen and less time care planning. Gretillat told Priske that she was physically unable to work full shifts in the kitchen because of the need to stand for long periods of time.

On December 4, 2003, Gretillat told Dr. Fehrle that Care Initiatives was increasing her physical demands at work. Gretillat stated that she was struggling to meet Care Initiatives's new demands and needed restrictions. On the same date, Dr. Fehrle faxed a restriction to Care Initiatives. Dr. Fehrle restricted Gretillat from standing on her right knee for more than one hour at a time without rest. Dr. Fehrle's form contained unchecked boxes for restrictions on bending, crawling, reaching, squatting, stooping, finger movement, climbing, kneeling, sitting, standing, walking, wrist and hand movement.

On February 17, 2004, Gretillat was covering in the kitchen for absent staff. After working three and a half hours of a four hour shift, Gretillat was unable to walk, limping and in a lot of pain. She told Priske that "I can't take it anymore" and informed him that she was unable to work full shifts in the kitchen.

On the same date, Dr. Fehrle examined Gretillat and concluded that she had full

extension of her knee with flexion to 115 degrees, was "doing well," and "can return to work and do whatever she wishes." It is unclear whether Gretillat was examined before or after going to work.

Priske ordered Gretillat to undergo a fitness-for-duty medical exam. On February 23, 2004, Wendy Paca, a nurse practitioner, conducted the exam. Pace asked Gretillat to kneel, squat, crouch and crawl, but Gretillat declined. Paca reported Gretillat stated "that given her right total knee replacement it is contraindicated for her to kneel, crouch or squat and she admits to me that . . . she cannot do this today."

Priske told Gretillat that she would be expected to work in the kitchen two to three days a week. Since Gretillat could not do so, Priske told her that she could either resign or be fired. Gretillat resigned effective March 26, 2004.

## IV. PRIOR PROCEEDINGS

On December 14, 2004, Gretillat filed a Petition against Care Initiatives in the Iowa District Court In and For Hardin County.[3] Gretillat alleged disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Iowa Civil Rights Act (ICRA), Iowa Code chapter 216. Gretillat contends Care Initiatives intentionally discriminated against her because it asked her to perform physically demanding tasks after her surgery. The gist of Gretillat's lawsuit is that Care Initiatives effectively removed reasonable accommodations it had previously afforded her. Gretillat sought compensatory damages, front pay, attorney fees and costs. On January 3, 2005, Care Initiatives removed the instant lawsuit to this court on the basis of federal question jurisdiction. *See* 28 U.S.C. § 1331 (federal question jurisdiction); *see also id.* § 1446(b)

---

[3] Gretillat obtained right-to-sue letters from the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission on September 21, 2004 and October 6, 2004, respectively.

(removal).

On September 20, 2005, Care Initiatives filed the instant Motion for Summary Judgment. On November 7, 2005, Gretillat filed a Resistance. On November 17, 2005, Care Initiatives filed a Reply.

## *V. ANALYSIS*

Gretillat claims disability discrimination under the ADA and the ICRA. Disability discrimination claims under the ICRA are generally analyzed under the same framework as that used for claims brought under the ADA. *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 n.3 (8th Cir. 2005) (citing *Fuller v. Iowa Dep't of Human Servs.*, 576 N.W.2d 324, 329 (Iowa 1998)). Because the parties do not argue that Gretillat's ICRA claim must be analyzed differently than her ADA claim, the court shall analyze both claims under the federal analysis. *See McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to "forge new ground" under the ICRA where neither party argued that the federal analysis should not apply).

To prove disability discrimination, Gretillat must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. 42 U.S.C. § 12112(a) (prohibiting discrimination "against a qualified individual with a disability because of the disability"); *see, e.g.*, *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 684 (8th Cir. 2003) (setting forth elements of ADA claim); *Moysis v. DTG Datanet*, 278 F.3d 819, 824 (8th Cir. 2002) ("To prove his ADA claim, [the plaintiff] had to show he was disabled, qualified to perform the job, and was terminated because of his disability."). An employer can discriminate by failing to reasonably accommodate a known physical limitation of an employee. 42 U.S.C. § 12112(b)(5)(A); *see, e.g., Nuzum v. Ozark Auto. Distrib., Inc.*, 432 F.3d 839, 842-49 (8th

6

Cir. 2005) (discussing a failure to accommodate claim under the ADA).

Care Initiatives argues that Gretillat's claim fails for three reasons: (1) Gretillat is not disabled; (2) Gretillat is not qualified to perform the essential functions of her job; and (3) there is no evidence Gretillat was fired because she has a disability. To the extent necessary, the court considers these arguments in turn.

### A. Is Gretillat Disabled?

Under the ADA, Gretillat is disabled if she (1) has a physical or mental impairment that substantially limits one or more of her major life activities; (2) has a record of such impairment; or (3) has been regarded as having such an impairment. 42 U.S.C. § 12102(2). The parties only discuss the so-called "actually disabled" prong of the statute, i.e., whether Gretillat has "a physical or mental impairment that substantially limits one or more of [her] major life activities." *Id*. In other words, Gretillat claims she is actually disabled, as opposed to having a record of a disability or being regarded as disabled. *See, e.g., Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1087-89 (8th Cir. 2000) (distinguishing between "actually disabled" disability discrimination claim and other disability discrimination claims); *cf. Moysis*, 278 F.3d at 824-25 (noting only an actual disability was at issue even though the ADA also provides a cause of action for a perceived disability or a record of disability). Therefore, to establish a disability in this case, Gretillat must show that she (1) has a physical or mental impairment and (2) that physical or mental impairment substantially limits one or more of her major life activities. 42 U.S.C. § 12102(2)(A); *see Nuzum*, 432 F.3d at 843 ("The principal meaning of 'disability' consists of two parts: the individual must have (1) 'a physical or mental impairment' that (2) 'substantially limits one or more major life activities' of the individual.").

The parties do not dispute that Gretillat's bad right knee is a "physical impairment." Rightly so. Federal regulations define "physical impairment" as including "any

7

physiological disorder or condition" that affects the "musculoskeletal" body system. 45 C.F.R. § 84.3(j)(2)(i) (2005); *see, e.g., Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 194-95 (2002) (discussing same federal regulation). A bad right knee is a physiological condition that affects the musculoskeletal system.

Gretillat claims her bad right knee substantially limits her ability to walk, stand, squat, kneel, crawl, crouch and work. Gretillat maintains that walking, standing, squatting, kneeling, crawling, crouching and working are all "major life activities."

In determining whether Gretillat's bad right knee substantially limits a major life activity, the court is mindful of the Supreme Court's admonition that the phrases "major life activities" and "substantial limitation" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Williams*, 534 U.S. at 197; *accord Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 768 (8th Cir. 2004). The court is also cognizant of the Eighth Circuit Court of Appeals' admonition that "establishing 'disability' is a significant hurdle." *Nuzum*, 432 F.3d at 842 (citing *Williams*, 534 U.S. at 201). "An individual does not prove that . . . she has a disability simply by showing an impairment that makes it impossible to do . . . her particular job without accommodation." *Id.*

### *1. Which limitations did Care Initiatives know about?*

Before deciding whether Gretillat is substantially limited in any major life activities, the court must answer an important threshold question. Care Initiatives argues that the only alleged "major life activity" the court should consider is standing. Care Initiatives claims Gretillat did not inform Care Initiatives of any other limitations during her employment, and, therefore, Care Initiatives could not have discriminated against Gretillat because of such unknown limitations. *See* 42 U.S.C. § 12112(a) (prohibiting discrimination "against a qualified individual with a disability *because of* the disability")

(emphasis added).[4]

Care Initiatives points out that Dr. Fehrle initially cleared Gretillat for work without any restrictions. The only restriction Dr. Fehrle placed on Gretillat during her employment was that she not stand more than one hour consecutively without a break.[5] On both restriction forms, Dr. Fehrle failed to check boxes for restrictions on kneeling, crawling, squatting or walking. Indeed, Dr. Fehrle's own examination notes corroborate what Dr. Fehrle told Care Initiatives. For example, on February 17, 2004, Dr. Fehrle wrote:

> [Connie] states that she is doing well. She really isn't having any trouble at all at work. They are going to have her start doing more increased standing though at work. . . . She can move her knee well. . . . [Examination] today shows her to have full extension of the knee. She has flexion to 115 degrees. . . . .
> . . . . At this point I do believe that she is doing well.
> . . . . I do think she can return to work and do whatever she wishes. . . . .

In her deposition, Gretillat admitted the only restriction she provided to Care Initiatives during her employment was the limitation on standing for more than one hour consecutively without a break.

---

[4] Although the court analyzes Care Initiatives's argument under the first element of Gretillat's claim, i.e., whether Gretillat has shown she suffers a disability *within the meaning of the ADA*, this argument could just as easily be analyzed under the third element of her claim, i.e., whether Gretillat suffered adverse employment action *because of* a disability.

[5] The parties dispute whether Care Initiatives had knowledge of this standing restriction, but the court shall resolve this dispute in favor of Gretillat because the court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See McCoy*, 411 F.3d at 922; *Woods*, 409 F.3d at 990.

Care Initiatives maintains it did not become aware of any limitations other than a standing limitation until after Gretillat's employment ended. In an affidavit dated October 28, 2005, after Care Initiatives filed the instant Motion for Summary Judgment, Dr. Fehrle testified:

> Connie suffered from a disability both before and after her surgery. Connie's ability, both before and after surgery, is significantly worse or lower compared with the average person of her same age and sex, in performing the following activities: walking for long distances, standing for longer than one hour, kneeling, crouching, squatting and crawling. . . . Connie is permanently restricted in the activities of kneeling, crouching, squatting and crawling.

Care Initiatives contends it could not have discriminated against Gretillat because of such limitations because it did not know about them during Gretillat's employment. Care Initiatives also maintains it had the right to rely on Dr. Fehrle's assessments of Gretillat's condition during Gretillat's employment.

Gretillat does not respond to Care Initiatives's arguments in her Resistance. "When a motion for summary judgment is made and supported . . . [and] the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). The court finds summary judgment is appropriate as to Gretillat's alleged inabilities to squat, crawl, crouch and kneel.

Summary judgment as to Gretillat's alleged inabilities to squat, crawl, crouch and kneel is appropriate because an employer is not required to make an accommodation for the physical limitation of an employee unless the employer has knowledge that such a limitation exists. *See, e.g., Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 629-30 (8th Cir. 1995) (holding defendant was not required to make a reasonable accommodation for an employee because the employee did not apprise defendant that she suffered from a mental

impairment). Care Initiatives could not have discriminated against Gretillat because it had no knowledge of the limitations. Under the ADA, an employer discriminates when it fails to "mak[e] reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee." 42 U.S.C. § 12112(b)(5)(A) (emphasis added); *see also* 29 C.F.R. § 1630.9(a) (2005) (same). "[A]n employer is not expected to accommodate disabilities of which it is unaware." *Miller*, 61 F.3d at 629 (citing 29 C.F.R. app. § 1630.9 (1994)). The logic of this proposition is overwhelming and has been affirmed repeatedly by other courts construing . . . the ADA . . . ." *Id.* at 629-30 (citations omitted). "'The ADA does not require clairvoyance.'" *Id.* at 630 (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995)). It would also be difficult to charge Care Initiatives with knowledge of Gretillat's squatting, crawling, crouching and kneeling limitations in light of the fact that Gretillat's own doctor informed Care Initiatives twice during the course of Gretillat's employment that no such restrictions were needed. *See, e.g., Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) (holding employer "was entitled to rely and act upon the written advice from [the employee's] physician"). For the foregoing reasons, the court shall not consider whether squatting, crawling, crouching and kneeling are major life activities or whether Gretillat's bad right knee substantially limits her ability to engage in them.[6]

---

[6] It could be argued that Care Initiatives was aware of Gretillat's kneeling, crouching and squatting limitations because, after Gretillat's fitness-for-duty exam, Paca reported to Care Initiatives that Gretillat stated "that given her right total knee replacement it is contraindicated for her to kneel, crouch or squat and she admits to me that . . . she cannot do this today." Such an argument would fail for two reasons: (1) Paca's report does not indicate that Gretillat had a permanent or long-term limitation, *see Williams*, 534 U.S. at 198 ("The impairment's impact must . . . be permanent or long term.") (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001)), and (2) Care Initiatives was entitled to rely on Dr.
(continued…)

In spite of Gretillat's failure to respond to Care Iniatives' argument, the court cannot overlook the fact that Care Initiatives was aware of the difficulties Gretillat had walking long distances. *See Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005) (cautioning that under Rule 56(e) a failure to respond does not automatically compel summary judgment because the district court must still determine whether summary judgment is appropriate) (citing *United States v. One Parcel of Real Prop.*, 27 F.3d 327, 329 (8th Cir. 1994)). Gretillat told her supervisor, Priske, that it hurt to walk long distances. Priske also admitted he personally observed that Gretillat had trouble walking long distances. Indeed, Priske excused Gretillat from making rounds of the facility due to Gretillat's difficulty walking long distances. In April of 2004, Priske admitted that Gretillat's forced resignation arose out of Gretillat's problems with standing *and* "ambulating." *See, e.g., Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 727 (8th Cir. 1999) (finding "ample evidence" that employee alerted employer to the existence of disability where employee told employer about disability, gave employer information about the ADA, requested an unmonitored telephone line to talk with his "support network," and displayed symptoms of the disability at work); *see also Miller*, 61 F.3d at 630 (quoting *Hedberg*, 47 F.3d at 934) (recognizing that employer has notice of limitation when

---

[6](…continued)
Fehrle's correspondence, which indicated no such problems, *see, e.g., Alexander,* 321 F.3d at 727 (holding employer justified in relying upon plaintiff's physician). It is also unclear whether squatting, crawling, crouching and kneeling are major life activities, i.e., activities "of central importance of daily life." *Williams*, 534 U.S. at 197; *see, e.g.*, *Black v. Roadway Express, Inc.*, 297 F.3d 445, 450 (6th Cir. 2002) (kneeling is not a major life activity); *see also Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996) (climbing is not a major life activity because it is "not . . . a basic, necessary function"). *But see Prince v. Claussen*, 173 F.3d 864 (10th Cir. 1999) (unpublished table disposition) (squatting is a major life activity).

disability manifests itself to the extent that "it would be reasonable to infer that [her] employer actually knew of the disability").

Because Care Initiatives was apprised of Gretillat's walking limitation and (as Care Initiatives concedes) her standing limitation, the court shall turn to consider whether walking and standing are "major life activities." 42 U.S.C. § 12102(2)(A). If so, the court shall then decide whether Gretillat's bad right knee has effected a "substantial limitation" upon those major life activities. *Id.*

### *2. Is Gretillat "substantially limited" in the "major life activities" of walking, standing and working?*

#### *a. Are walking, standing and working "major life activities"?*

Major life activities are "activities that are of central importance to daily life." *Williams*, 534 U.S. at 197. The Eighth Circuit Court of Appeals has held that walking and standing are major life activities. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999); *Weber v. Strippit, Inc.*, 186 F.3d 907, 912-13 (8th Cir. 1999); *see also Williams*, 534 U.S. at 195 (noting that federal regulations include walking as a major life activity) (citing 45 C.F.R. § 84.3(j)(2)(ii) (2001)). The Eighth Circuit Court of Appeals has also indicated that working is a major life activity. *See Nuzum*, 432 F.3d at 844 ("[O]ur Circuit has considered [working to be a major life activity].") (citing *Weber*, 186 F.3d at 914, and *Fjellestad*, 188 F.3d at 949). *But see Williams*, 534 U.S. at 200 (assuming but not deciding whether working is a major life activity); *Sutton v. United Air Lines,* 527 U.S. 471, 492 (1999) (same); *Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1087 (8th Cir. 2000) (similarly reserving judgment). The fighting issue, then, is whether Gretillat's bad right knee has substantially limited her ability to walk, stand or work.

#### *b. Is Gretillat "substantially limited" in her ability to walk, stand or work?*

According to the Supreme Court, "'[s]ubstantially' in the phrase 'substantially

limits' suggests 'considerable' or 'to a large degree.'" *Williams,* 534 U.S. at 196 (quoting Webster's Third New International Dictionary 2280 (1976)). "The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with [a major life activity] from qualifying as disabilities." *Id.* (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 565 (1999)). To show that a major life activity is substantially limited, the plaintiff must have an impairment that "prevents or severely restricts" the major life activity. *Wood*, 339 F.3d at 685 (citing *Williams*, 534 U.S. at 198).

In determining whether an impairment substantially limits a major life activity, the court must consider the nature, severity, duration and long-term impact of the impairment. *Id.* (citing 29 C.F.R. § 1630.2(j)(2) (2002) and *Cooper v. Olin Corp.*, 246 F.3d 1083, 1088 (8th Cir. 2001)). "An impairment is substantially limiting if an individual is 'significantly restricted as to the condition, manner or duration under which . . . the average person in the general population can perform that same major life activity.'" *Moysis*, 278 F.3d at 825 (citing 29 C.F.R. § 1630.2(j)(ii)). "The impairment's impact must . . . be permanent or long term." *Williams*, 534 U.S. at 198 (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001)).

### *i. Walking and standing*

Although Gretillat's bad knee implicates the major life activities of walking and standing, the court finds as a matter of law that her knee does not "substantially limit" her ability to walk or stand. One Eighth Circuit Court of Appeals case is particularly instructive. In *Wood*, the plaintiff alleged that he was substantially limited in the major life activities of walking and standing. 339 F.3d at 685-86. The plaintiff could only walk approximately one-quarter of a mile before he had to stop and take a rest. *Id.* at 685. The plaintiff also had numbness in his left foot, numbness in his left leg, and his left leg would occasionally collapse. *Id.* He also used a cane. *Id.* The plaintiff, however, could walk

14

well enough that he had not obtained a handicapped parking pass and could perform many manual tasks in his daily life. *Id.* at 685-86. The Eighth Circuit Court of Appeals held:

> [W]e acknowledge Wood's ability to walk is limited, but, using the *Williams* standard, we do not believe the evidence demonstrates a severe walking restriction. This conclusion conforms with our precedent . . . that difficulty walking long distances or climbing stairs without getting fatigued are moderate limitations on major life activities that do not suffice to constitute a "disability" under the ADA. We categorize Wood's walking limitations as moderate, not substantial, for ADA purposes. . . . [W]e are confident the record fails to show Wood's ability to walk is substantially limited.

*Id.* at 685 (internal quotation omitted). The Eighth Circuit Court of Appeals also held that the plaintiff's alleged standing limitation, while "real" and "certainly inconven[ient]", was "insufficient to sustain an ADA claim given the high bar set by *Williams*." *Id.* at 686; *see also Dupre v. Charter Behavioral Health Sys.*, 242 F.3d 610, 614 (5th Cir. 2001) (inability to stand in one place for up to one hour not a disability); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186 (3d Cir. 1999) (no disability where employee required hourly breaks while standing or walking); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998) (inability to stand for "any period of time" not a disability).

The same analysis applies with equal force here, as Gretillat's limitations are similar to those at issue in *Wood*. Although Gretillat's inability to walk long distances and stand for more than one hour at a time certainly inconvenience her life, they are moderate, not severe restrictions. Factually, Gretillat's limitations are less severe than those of the plaintiff in *Wood*: there is no evidence Gretillat uses a cane or experiences numbness. This holds true regardless of whether Gretillat's limitations are judged individually or together. *See Nuzum*, 432 F.3d at 845 (recognizing that "a substantial limitation of a constellation of . . . basic motor functions could suffice to prove a disability").

It is important to note that, like the plaintiff in *Wood*, Gretillat testified in her deposition that her knee condition does not affect her ability to do most manual tasks, other than having to take occasional breaks. *See Wood,* 339 F.3d at 685-86; *see also Williams*, 534 U.S. at 202 (noting that there was no evidence in the record that the plaintiff's impairment impacted lifting tasks central to most people's daily lives, e.g., "household chores, bathing, and brushing one's teeth"). Gretillat testified her bad right knee did not affect her ability to care for herself, to get her own meals, to perform household chores or to drive.

Similarly, at work Gretillat found ways to perform tasks that otherwise might involve squatting, crouching, crawling or kneeling. For example, instead of squatting to get things out of the bottom of a refrigerator, Gretillat would bend over sideways, get a pair of tongs or a long-handled spoon or ask a co-worker to help. Gretillat's admitted ability to compensate for her limitations weighs against a finding that she is disabled under the ADA. *See Williams,* 534 U.S. at 198 (directing district courts to analyze "the extent of the limitation . . . in terms of [the plaintiff's] experience" and the individual's ability to compensate for the impairment) (citing *Albertson's*, 527 U.S. at 567) (holding that monocular vision is not invariably a disability, but should be analyzed on an individual basis taking into account the individual's ability to compensate for the impairment); *Ristrom*, 370 F.3d at 769 (holding that the alleged disability cannot qualify as a disability *per se* but "must satisfy the ADA's demanding standard in each individual case in the context of the major life activity asserted"). Dr. Fehrle's post-employment medical diagnosis of limitations cannot, by itself, prove disability status. *Williams,* 534 U.S. at 198; *Fenney v. Dakota, Minn. & E. R.R. Co.,* 327 F.3d 707, 715 n.16 (8th Cir. 2003).

For the foregoing reasons, the court finds Gretillat is not "disabled" under the ADA, because she is not substantially limited in the major life activities of walking or

standing.

### ii. Working

The Supreme Court has made clear that if working is a major life activity, special rules apply. With respect to the major life activity of working, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton,* 527 U.S. at 491. "To be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* at 492 (citing 29 C.F.R. § 1630.2(j)(3)(i) (1998) (inability to perform singular, particular job is not a substantial limitation on the major life activity of working)).

Similarly, the Eighth Circuit Court of Appeals has provided the following rubric for deciding cases involving an alleged substantial limitation upon the major life activity of working:

> A plaintiff alleging a substantial limitation in the ability to work must demonstrate an inability to work in a broad class of jobs, and show that he has suffered a significant reduction in meaningful employment opportunities as a result of his impairments. An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.

*Wood,* 339 F.3d at 686 (citations and internal quotation marks omitted). The Eighth Circuit Court of Appeals has also commented favorably on the EEOC's regulations, which provide that an individual is substantially limited in the major life activity of working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (1999) (quoted in *Kellogg*, 233 F.3d at 1086-87). Those regulations contemplate that the court consider the nature, severity

17

duration and impact of the disability, *see* 29 C.F.R. § 1630.2(j)(2)(i)-(iii) (2005), as well as:

> (A) the geographical area to which the individual has reasonable access; (B) the job from which the individual has been disqualified because of the impairment and the class of similar jobs from which the individual also is disqualified because of the impairment; and/or (C) the job from which the individual has been disqualified and the broad range of jobs in various classes from which the individual also is disqualified because of the impairment.

*Kellogg*, 233 F.3d at 1087 (citing 29 C.F.R. § 1630.2(j)(3)(ii) (2005)). "At bottom, a court must consider, on a case-by-case basis, 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Id*. (quoting *Fjellestad*, 188 F.3d at 949).

Gretillat has presented insufficient evidence to show that her bad right knee constitutes a significant barrier to employment. There is no evidence in the record concerning the geographical area to which Gretillat has reasonable access or the number and types of jobs in the local employment market that remain available to her. Thus, there is no evidence that would support a finding that Gretillat is unable to work in a broad class of jobs. *See Hansen v. Seabee Corp.*, 688 N.W.2d at 243 (Iowa 2004) (similarly lamenting dearth of evidence in ADA lawsuit and remanding for entry of verdict in favor of defendant) (citing *Duncan v. Wash. Metro. Transit Auth.,* 240 F.3d 1110, 1115-16 (D.C. Cir. 2001) (en banc), *cert. denied,* 534 U.S. 818 (2001); *Gelabert-Ladenheim v. Am. Airlines, Inc.,* 252 F.3d 54, 62 (1st Cir. 2001); and *EEOC v. Rockwell Int'l Corp.,* 243 F.3d 1012, 1018 (7th Cir. 2001)).

What little evidence exists in the record concerning Gretillat's employment prospects counsels against finding that Gretillat is substantially limited in the major life

activity of working. For example, in her deposition Gretillat admitted she thought that she could do a variety of jobs. Gretillat testified she thought that she could perform sedentary jobs such as working as a hotel clerk, printing brochures for a newspaper and working a desk job at an auto shop. She also testified she could work at more physically demanding jobs, such as making pizzas at a local restaurant, stocking shelves and running cash registers at the Dollar General and working in an emergency room.

While Gretillat apparently did not get any of these jobs, only the United States Postal Service (USPS) turned her down because she was physically unable to perform the job. It is well settled, however, that an inability to perform one particular job is not a substantial limitation on working. *Philip v. Ford Motor Co.,* 328 F.3d 1020, 1024 (8th Cir. 2003). "Instead, a plaintiff must show that because of his impairment he has suffered a significant reduction in meaningful employment opportunities." *Id.*; *accord Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001) (holding that one who is precluded from working a narrow range of jobs is not disabled). Because Gretillat has introduced no evidence of an inability to work in a broad class of jobs, she is not substantially disabled in the life activity of working. *See Wood*, 339 F.3d at 684-87 (affirming district court for same reason).

For the foregoing reasons, the court finds Gretillat is not "disabled" under the ADA because she is not substantially limited in the major life activity of working. Accordingly, the court shall grant Care Initiatives's Motion for Summary Judgment in its entirety.

### B. Remaining Arguments

Because the court finds Gretillat was not disabled, it need not decide whether Gretillat is qualified to perform the essential functions of her job or whether there is evidence Gretillat was fired because she has a disability.

## VI. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED**:

(1) Defendant's Motion for Summary Judgment (docket no. 10) is **GRANTED**;

(2) Plaintiff's lawsuit is **DISMISSED** with prejudice;

(3) All pending motions, specifically Defendant's Motion in Limine (docket no. 18), are **DENIED AS MOOT**; and

(4) The Clerk of Court is directed to enter judgment accordingly and to assess all court costs against Plaintiff.

**IT IS SO ORDERED.**

**DATED** this 13th day of February, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA